IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,          )        Criminal Case No. 07-349-KI
                               )
      vs.                       )        OPINION AND ORDER
                               )
CASEY REILLY GLEASON,          )
                               )
            Defendant.          )
_____)

       Karin J. Immergut
       United States Attorney
       District of Oregon
       Gregory R. Nyhus
       Assistant United States Attorney
       1000 S. W. Third Avenue, Suite 600
       Portland, Oregon  97204-2902

           Attorneys for Plaintiff

       Gerald M. Needham
       Assistant Federal Public Defender
       101 S. W. Main Street, Suite 1700
       Portland, Oregon  97204

           Attorney for Defendant

KING, Judge:

Defendant Casey Reilly Gleason is charged in a three-count Indictment.  Count One alleges a violation of 18 U.S.C. §§ 2252A(a)(1) and (b)(1), Transportation of Child Pornography. Counts 2 and 3 allege violations of 18 U.S.C. §§ 2252A(a)(5)(A) and (b)(2), Possession of Child Pornography.  Before the court is Gleason's Motion to Dismiss for Lack of Jurisdiction (#28). For the reasons below, I grant the motion and dismiss Count 3.[1]

## FACTS

In October 2005, Gleason was an employee of DynCorp International, Z-LLC ("DynCorp"), a corporation registered in Dubai, United Arab Emirates.  Gleason was hired by DynCorp to train Afghan police officers under the Civilian Policing Contract awarded by the International Narcotics and Law Enforcement Bureau of the United States Department of State. Gleason was performing the training in a police training facility in Jalalabad, Afghanistan.

On October 25, 2005, a laptop computer allegedly containing child pornography was seized from the Afghan police training facility.  Gleason was not present at the time of the seizure.  Count 3 is based on images located on this laptop.

## DISCUSSION

Gleason moves to dismiss Count 3, which alleges:

> On or about October 25, 2005, in the special maritime and territorial jurisdiction of the United States, **CASEY REILLY GLEASON**, defendant herein, did knowingly possess images containing child pornography, as defined in Title 18, United States code, Section 2256(8), located on computer generated media which contained visual depictions of minors engaged in sexually explicit conduct, and such items having been mailed, shipped, or transported in interstate

---

[1]  Although I allowed Gleason time to file a supplemental brief, and the government time to file a response to it, I have decided that further briefing is unnecessary to decide the motion.

commerce, including by computer; all in violation of Title 18, United States Code, Sections 2252A(a)(5)(A) and 2252A(b)(2).

Indictment at 2.

Gleason argues that the police training facility is not part of the "special maritime or territorial jurisdiction of the United States," as defined in 18 U.S.C. § 7. The United States relies on the following two parts of the definition:

> The term "special maritime and territorial jurisdiction of the United States", as used in this title, includes:
>
> (3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

and

> (9) With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act—
>
> (A) the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and
>
> (B) residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.
>
> Nothing in this paragraph shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts. This paragraph does not apply with respect to an offense committed by a person described in section 3261(a) of this title.

18 U.S.C. §§ 7(3), (9).

I.    Jurisdiction under Subsection 7(3)

The government argues that Subsection 7(3) is made more definitive by Subsection 7(9) and that jurisdiction exists as long as the land is set aside for the use of an instrumentality of the federal government, no matter who owns or occupies the land.  Thus, the government argues that jurisdiction exists under Subsection 7(3), as clarified by Subsection 7(9), because Gleason was under contract to support a task order under the Civilian Policing Contract awarded by the International Narcotics and Law Enforcement Bureau of the State Department.

Gleason disagrees that Subsection 7(9) only clarifies Subsection 7(3) and contends that the two subsections are distinct areas where the government may assert special maritime or territorial jurisdiction.

I agree with Gleason.  Section 7 is divided into nine subsections which discuss very different places where jurisdiction exists, including, in part, the high seas in subsection (1); vessels on the Great Lakes in subsection (2); islands, rocks, or keys containing deposits of guano in subparagraph (4); and space vehicles in subsection (6).  Subsection (9) was added as part of the Patriot Act of 2001, in a section entitled "Jurisdiction over Crimes Committed at U.S. Facilities Abroad."  Pub. L. No. 107-56, § 804.  I interpret the different subsections of Section 7 to each stand on their own and will analyze them separately.

According to Gleason, he both lived and worked at the police training facility, which was operated by the Afghan National Police.  The facility was not protected by the United States military and there were no United States military forces patrolling or working at the facility.

Gleason argues that Subsection 7(3) does not apply because the Afghan police training facility was not on land reserved for the United States and the United States had neither exclusive or concurrent jurisdiction over the facility nor use or control over the site.

Page 4 - OPINION AND ORDER

The government agrees that the facility was owned and operated by the Afghan National Police but notes that it was provided to DynCorp to facilitate a residence for people responsible for training the Afghan police, pursuant to ancillary housing needs from DynCorp's training contract. The government also admits that the facility was not under the jurisdiction of the United States Department of State.

I first note that Subsection 7(3) covers two locations. The first location is at issue here: "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof." The second location is not at issue and will not be discussed further: "or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building."

"[S]ubsection 7(3) applies to Americans in all territory, wherever situated, that is acquired for the use of the United States and under the exclusive or concurrent jurisdiction of the federal government." United States v. Corey, 232 F.3d 1166, 1172 (9th Cir. 2000), cert. denied, 534 U.S. 887 (2001). There is no requirement that the United States own or occupy the land. Id. at 1177.

      A.    Acquired for the Use of the United States

     Corey concluded that an Air Force base in Japan was acquired for the use of the United States. As part of its surrender in World War II, Japan agreed that the United States would control land on which the base was located. Id. Corey also held that an apartment building in the Philippines that the State Department leased from a private landlord for the purpose of housing embassy personnel was acquired for the use of the United States. The government furnished and maintained the apartments, the lease ran without regard to the residence of any particular

employee, and the government paid the rent and utilities and provided security for the building.
Id.

James Bond, Senior Counsel of Foreign and International Law for DynCorp, testified at
the hearing that Afghanistan and the United States jointly picked the land on which the training
facility was built but the land was owned solely by the Afghanistan government and neither the
United States nor DynCorp paid fees to lease the land. The training facility was to train Afghan
police officers. The facility was not built to perform a solely American function such as provide
office space or a residence to be used primarily by Americans. I conclude that the land was not
acquired for the use of the United States.

B.    Exclusive or Concurrent Jurisdiction

Corey also held that the United States exercised exclusive or concurrent jurisdiction over
both the base and the apartment.

The provision refers to legislative jurisdiction, also known as the jurisdiction to prescribe.
Id. "[S]ubsection 7(3) grants the courts jurisdiction over those territories over which the
government enjoys regulatory authority." Id. at 1178. The standard has been described as one
of "practical usage and dominion," namely, "whether the United States enjoys such control over
the area that the law should constructively regard it as United States territory." Id.

Corey held that the standard was met on the Air Force base because of a treaty, the
Agreement under Article VI of the Treaty of Mutual Cooperation and Security Between the
United States of America and Japan, Regarding Facilities and Areas and the Status of the United
States Armed Forces in Japan ("SOFA"). The SOFA expressly recognized United States
jurisdiction to try civilian employees for crimes committed on the base. Id. at 1181-82. Corey
also noted that Japanese environmental, labor, and other regulatory statutes were not enforced on

the base, American lawyers and doctors practice there without Japanese licenses, gambling is allowed on the base even though it is strictly illegal in Japan, the United States government conducts all criminal investigations, and Japanese police may not enter the base without the permission of the United States. Id. at 1182.

Likewise, Corey held that the United States exercised exclusive or concurrent jurisdiction over the Philippines apartment building housing embassy personnel based on diplomatic norms constraining a host state from exercising its authority without consent of the embassy. The diplomatic norms were codified in a treaty, the Vienna Convention on Diplomatic Relations. The Convention states that the host country may not enter embassy grounds without consent of the sending state and further acknowledges that private residences of embassy personnel enjoy the same inviolability as the embassy, even if not located on the embassy premises. The Convention also expressly states that the sending state may exercise criminal jurisdiction over diplomatic personnel. Moreover, the United States posted security personnel at the doors of the apartment building. Id. at 1182-83.

We have no document here specifying the jurisdiction over the training facility. Bond testified that in 2003, the State Department sent a letter to the Afghan government explaining that DynCorp employees would be coming to work under the auspices of the State Department. Bond had never personally seen this letter because it was destroyed in a car bombing in 2004. Bond also testified that a March 9, 2006 Letter of Agreement on Police, Criminal Justice and Counternarcotics Support Programs between the government of the United States of America and the Islamic Republic of Afghanistan ("Letter of Agreement"), which was provided to the court, codified the conduct of DynCorp, the police training facility, and some other programs, dating

back to the 2003 informal letter.  Bond also testified that there had been no major changes in the program after the Letter of Agreement was put in place.

I am unwilling to consider the Letter of Agreement as a relevant document because it was executed four months after the laptop was seized.  I do not doubt Bond's testimony, but giving effect to a Letter of Agreement between the United States and a foreign government prior to the Letter of Agreement's execution date is no small thing.  The Letter of Agreement does not refer to the 2003 letter.  The 2003 letter is not in evidence because it no longer exists, at least not in the hands of DynCorp.  I am unable to treat the Letter of Agreement in the same manner <u>Corey</u> treated the SOFA and the Vienna Convention on Diplomatic Relations.

We have the following evidence.  DynCorp paid vendors directly for goods and services used at the training facility and was reimbursed by the State Department.  DynCorp procured communication services such as satellite phones and Internet connections from civilian providers.  The State Department and DynCorp jointly determined policy on who could enter the facility.  DynCorp employees provided security at the gates of the facility.  United States military personnel did not patrol or work at the facility.

There is no document on which I can rely to conclude that the United States exercised exclusive or concurrent jurisdiction over the training facility.  I do not think DynCorp's contractor status is sufficient to support that determination.

Accordingly, I find that jurisdiction does not exist under Subsection 7(3).

II.    <u>Jurisdiction under Subsection 7(9)</u>

Gleason contends that Subsection 7(9) does not apply because the Afghan police training facility had no association, contact, or other connection to the United States diplomatic, consular, military, or other government missions and also was not a residence used by United States

personnel.  He alternatively argues that the subsection expressly does not apply to a person

described in the Military Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. §3261(a), and he

is such a person.  I find the second argument dispositive and decline to address the first.

> Congress enacted MEJA in response to a jurisdictional gap created by host
> nations' reluctance to prosecute crimes against Americans committed by civilians
> accompanying the Armed Forces outside the United States.  H.R.Rep.
> No. 106-778(I)(2000), 2000 WL 1008725, at *5.  To close this gap, MEJA creates
> federal jurisdiction over those who commit felonies while "accompanying the
> Armed Forces outside the United States."  18 U.S.C. § 3261(a)(1).

United States v. Arnt, 474 F.3d 1159, 1161 (9th Cir. 2007).

Subsection 7(9) does not apply to offenses committed by people described in MEJA as

follows:

> Criminal offenses committed by certain members of the Armed Forces and
> by persons employed by or accompanying the Armed Forces outside the United
> States.
>
> (a) Whoever engages in conduct outside the United States that would constitute an
> offense punishable by imprisonment for more than 1 year if the conduct had been
> engaged in within the special maritime and territorial jurisdiction of the United
> States—
>
> (1) while employed by or accompanying the Armed Forces outside the United
> States; or
>
> (2) while a member of the Armed Forces subject to chapter 47 of title 10 (the
> Uniform Code of Military Justice),
>
> shall be punished as provided for that offense.

18 U.S.C. § 3261(a).  The issue is whether Gleason is employed by the Armed Forces outside the

United States, as defined by:

> As used in this chapter:
>
> (1) The term "employed by the Armed Forces outside the United States" means—
>
> (A) employed as—

Page 9 - OPINION AND ORDER

. . . .

(iii) an employee of a contractor (or subcontractor at any tier) of—

(I) the Department of Defense (including a nonappropriated fund instrumentality of the Department); or

(II) any other Federal agency, or any provisional authority, to the extent such employment relates to supporting the mission of the Department of Defense overseas;

(B) present or residing outside the United States in connection with such employment; and

(C) not a national of or ordinarily resident in the host nation.

18 U.S.C. § 3267(1).

I conclude that Gleason is an employee of a contractor of the Department of State and that his employment relates to supporting the mission of the Department of Defense overseas. DynCorp was training Afghan police officers beginning in 2003. I must assume that the training of Afghan civilian police was in support of the Department of Defense's efforts against the Taliban since October 2001. A civilian police force would be needed to take the place of the overthrown regime.

Thus, Gleason is a person described in MEJA. Section 7(9) expressly does not apply to him and consequently the special maritime and territorial jurisdiction of the United States cannot be based on that subsection.

## CONCLUSION

Gleason's Motion to Dismiss for Lack of Jurisdiction (#28) is granted.  I dismiss Count 3.

IT IS SO ORDERED.

Dated this _____23rd_____ day of March, 2009.


                         _____/s/ Garr M. King_____

                         Garr M. King
                         United States District Judge